UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RITA HUBBARD-KLIK,

    Plaintiff,

v.                                                Case No. 08-10052
                                                Honorable Patrick J. Duggan

UNITED AMERICAN PAYROLL 17, INC.,
and RYAN SHERMAN,

    Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 18, 2008.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                    U.S. DISTRICT COURT JUDGE

Plaintiff initiated this lawsuit against Defendants, alleging that Defendants violated Michigan's Persons with Disabilities Civil Rights Act ("PDA"), MICH. COMP. LAWS ANN. §§37.1101-37.1607, and Michigan public policy when they terminated her on June 4, 2007. Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The motion has been fully briefed and the Court held a motion hearing on December 17, 2008. For the reasons that follow, the Court grants Defendants' motion.

**I.    Factual Background**

Defendant United American Payroll 17, Inc. ("UAP") is a human resources outsourcing organization that, among other things, handles payroll and other administrative activities for its clients. Defendant Ryan Sherman is the vice president and manager of UAP. Prior to November 2006, all of UAP's bookkeeping responsibilities were handled by Rhonda Jacobs who established and manages the company's accounting system.

Jacobs suffers from degenerative disc disease that had her confined to a wheelchair for approximately five years. In early 2007, Jacobs informed Sherman that she would need to take an extended medical leave of absence beginning June 2007 to undergo surgery on her spine. In preparation for her leave, UAP decided to hire a second bookkeeper who Jacobs could train and who could maintain the accounting during Jacobs' leave. UAP hired Plaintiff for that position on November 7, 2006.

Jacobs and Plaintiff were the only employees in UAP's accounting department and they shared a large office. As a bookkeeper, Jacobs was responsible for data entry, bank reconciliations, processing client checks for deposit, inputting State and Federal income tax collected from client employees, and balancing the books. Jacobs assigned Plaintiff her duties and provided her with instructions on how do to certain aspects of the accounting.

Shortly after Plaintiff began her employment, Jacobs noticed numerous errors and deficiencies in Plaintiff's work. Jacobs noted issues with Plaintiff's job performance in

2

"Activity Reports."[1] (Defs.' Mot. Exs. 4 & 8.) In her affidavit in support of Defendants' motion, Jacobs summarizes the deficiencies in Plaintiff's work noted in the Activity Reports as reconciliation errors, duplicating data entries, incorrectly inputting data, paying incorrect invoices, and overwriting formulas in the accounting software resulting in missed data. (*Id*. Ex. 4 ¶ 9.) Jacobs further indicates that she had to correct Plaintiff's errors to avoid UAP's books being out of balance. (*Id*.) During her deposition in this case, Plaintiff acknowledged that she made the job-related mistakes for which she was written-up. (Defs.' Mot. Ex. 2 at 218.)

Concerned that Plaintiff would not be able to handle the accounting functions on her own while Jacobs was on leave, Jacobs eventually contacted Sherman about Plaintiff's performance. (*Id*. Ex. 4 ¶¶ 11-12; Ex. 5 ¶ 10.) In or around March or April 2007, Jacobs informed Sherman that she wanted to delay her surgery due to her concerns about Plaintiff. (*Id*. Ex. 5 ¶ 12; Ex. 4 ¶ 12.) Sherman advised Jacobs to be patient and continue training Plaintiff. (*Id*.) About a month later, however, Sherman also observed Plaintiff's accounting errors first-hand and, according to Defendants, these errors led to her eventual termination.

On May 23, 2007, Sherman gave Plaintiff several checks from clients to process

---

[1]Separate from the work errors and/or deficiencies noted in these reports, during her employment with UAP, Plaintiff also received three written and/or verbal warnings for misconduct not related directly to the quality of her work: failing to punch out at the end of her shift; taking lengthy personal calls during business hours; and violating the dress code. (*Id*. Exs. 9-11.)

3

for deposit into UAP's account and requested that she return the checks to him. (Defs.' Mot. Ex. 5 ¶ 12.) At the end of the day, Sherman noticed that Plaintiff failed to process a $37,000 check for deposit and that Plaintiff had left the check on her desk. (*Id.*) Sherman therefore handled the check himself. Defendants contends that if Sherman had not caught Plaintiff's mistake, UAP would not have had sufficient funds to cover checks written on the account. (*Id.*) Sherman instructed Emily Berger, UAP's human resources director, to write-up Plaintiff for this incident. (*Id.*; Ex. 12 ¶ 6; Ex. 15.) Berger did so and met with Plaintiff to discuss the written warning. (*Id.* Ex. 12 ¶ 6.) Plaintiff acknowledged her mistake and took full responsibility for the error. (*Id.* Ex. 14; Ex. 2 at 218.)

Following Plaintiff's error on May 23, and because of her previous errors and performance issues, Sherman concluded that Plaintiff in fact would not be able to handle the responsibilities of the accounting department on her own during Jacobs' leave. (Defs.' Mot. Ex. 5 ¶ 13.) Therefore, on May 23, Sherman consulted with Berger and Jeanie Hayward (who is in charge of UAP's benefits department) about terminating Plaintiff. (*Id.*; Ex. 12 ¶ 7.) Sherman then discussed the accounting department with Jacobs, at which time Jacobs indicated that she would try to reschedule her surgery. (*Id.* Ex. 5 ¶ 14; Ex. 4 ¶ 14; Ex. 12 ¶ 8.) According to Sherman and Berger, they waited to inform Plaintiff of their decision to terminate her to see if Jacobs in fact could reschedule her surgery and so Plaintiff could assist Jacobs with the month-end taxes. (*Id.* Ex. 5 ¶ 15; Ex. 12 ¶ 9.)

In the meantime, on May 29, 2007, Plaintiff committed an inputting error that

4

Defendants claim would have cost UAP a significant amount of money if it had not been caught. (*Id*. Ex. 5 ¶ 16; Ex. 12 ¶ 10; Ex. 16.) Plaintiff keyed in an invoice gross amount as $145,671.48, when it should have been $14,571.48. (Ex. 16.) Sherman instructed Berger to write-up Plaintiff for this error. (*Id*. Ex. 12 ¶ 10.) Berger did so and met with Plaintiff on May 29 to discuss the matter. (*Id*.) Plaintiff did not dispute that she made the error. (*Id*.; Ex. 2 at 218, 222.)

On the same date, Jacobs was able to reschedule her surgery for August 24, 2007. (*Id*. Ex. 4 ¶ 15.) The following morning, Wednesday May 30, Jacobs sent Sherman an e-mail informing him of her new surgery date. (*Id.* ¶ 15; Ex. 17.) That same day, Plaintiff had an appointment with one of her doctors, Timothy Horrigan, for the purpose of obtaining a note indicating that she suffers from chronic dysthymia[2] and that she needs an "accommodation" at work for this condition. (Pl.'s Resp. Ex. B at 224-225.) As Plaintiff explained during her deposition, she requested a note from Dr. Horrigan because she

---

[2]Dysthymia is defined as:

> A type of depression involving long-term, chronic symptoms that are not disabling, but keep a person from functioning at "full-speed" or from feeling good. Dysthymia is a less severe type of depression than what is accorded the diagnosis of major depression. However, people with dysthymia may also sometimes experience major depressive episodes, suggesting that there is a continuum between dysthymia and major depression.

http://www.medterms.com/script/main/art.asp?articlekey=3147.

5

wanted Sherman to stop Jacobs from "harassing" her.[3] (*Id*. at 225.)

Dr. Horrigan provided Plaintiff with a note that read:

> Rita was evaluated 5/30/07 for stress-related aggravation of her chronic anxiety. I believe much of this to be due to her work situation and co-worker conflicts. It would be helpful for her health/well being if these issues could be resolved.

(Defs.' Mot. Ex. 19.) Plaintiff claims that she gave this note to Sherman at the end of the day on May 30.[4] (*Id.* Ex. 2 at 230-31.) According to Plaintiff, because there was someone in Sherman's office when she went to deliver the note, she simply handed it to Sherman and walked away. (*Id*.) Neither Sherman nor anyone else at UAP subsequently discussed Dr. Horrigan's note with Plaintiff. (*Id*. at 235.)

The following Monday, June 4, Sherman, Berger, and Hayward met with Plaintiff and informed her that her employment was being terminated. Sherman told Plaintiff that the reason for her termination was "too many errors." (Defs.' Mot. Ex. 2 at 239; Ex. 5 ¶ 18; Ex. 12 ¶ 12; Ex. 18.) According to Plaintiff, when Sherman first told her that she was

---

[3]During her deposition, Plaintiff testified that Jacobs was "constantly over [her] shoulder" and "was lashing out at [her]." (Defs.' Mot. Ex. 2 at 182.) Plaintiff, however, did not explain further why she felt "harassed" by Jacobs. There are references in the record to a "conflict" between Jacobs and Plaintiff; however, it is not apparent what this conflict was or to what it related. Based on Plaintiff's explanation regarding her alleged disability, however, it appears that Plaintiff believed Jacobs was nitpicking her work, yelling at her, and writing her up for ridiculous issues. (*Id*. at 116-17, 200-01.)

[4]In his affidavit submitted in support of Defendants' motion, Sherman states that "[Plaintiff] never provided me with any documentation from her doctor regarding a disability." (Defs.' Mot. Ex. 5 ¶ 9.) For purposes of deciding Defendants' motion, however, the Court will assume that Plaintiff did hand-deliver the note to Sherman. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 242, 255, 106 S. Ct. 2505 (1986).

being terminated, he said "we've decided to let you go, and it's not because of what you think it is." (*Id*. Ex. 2 at 238.)

## II. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence

presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

### III.	Applicable Law and Analysis

In Count I of her Complaint, Plaintiff alleges that Defendants violated the PDA by terminating her because she is disabled. In Count II, Plaintiff alleges that Defendants violated the PDA by terminating her because they regarded her as disabled. Finally, in Count III of her Complaint, Plaintiff alleges that Defendants violated Michigan public policy by terminating her.

####	A.	Plaintiff's Claims Under the PDA

Absent direct evidence of disability discrimination, as is the case here, a court must evaluate a plaintiff's claims under the PDA by applying the familiar burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462, 628 N.W.2d 515, 520-21 (2001). First, the plaintiff must establish a prima facie case of discrimination by presenting evidence that: (1) she is disabled as defined by the act or that the defendant regarded her as disabled; (2) the alleged disability is unrelated to her ability to perform the job; and (3) she was discriminated against in one of the ways described by the statute, such as being discharged because of a disability.[5] *Lown v. JJ Eaton Place*, 235 Mich. App. 721, 727, 598 N.W.2d 633, 636 (1999); *Chiles v. Machine*

---

[5] MICH. COMP. LAWS ANN. § 37.1202 sets forth the conduct prohibited by an employer based on an individual's disability.

*Shop, Inc.*, 238 Mich. App. 462, 473-75, 606 N.W.2d 398, 405-06 (1999). If the plaintiff succeeds, the defendant must articulate a legitimate, non-discriminatory reason for its employment decision. *Hazle*, 464 Mich. at 464, 628 N.W.2d at 521. If the defendant sets forth such a reason, to survive summary judgment, "the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is 'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.'" *Id.* at 465, 625 N.W.2d at 522 (quoting *Lytle v. Malady*, 458 Mich. 153, 176, 579 N.W.2d 906, 916 (1998)).

Defendants argue that they are entitled to summary judgment because Plaintiff is not disabled and they did not regard her as disabled, as that term is defined under the PDA. Further, Defendants argue that even if Plaintiff is disabled or was regarded as disabled, she cannot establish that she was terminated because of her disability or perceived disability. Finally, Defendants argue that even if Plaintiff can establish a prima case of disability discrimination, there was a legitimate, non-discriminatory reason for her termination– i.e. the errors she made in her work. Defendants contend that Plaintiff cannot show that this reason was a pretext for discrimination.

### 1. Whether Plaintiff is disabled or was regarded as disabled, as defined under the PDA[6]

---

[6]As indicated, Defendants also argue that Plaintiff cannot establish a prima facie case of discrimination because she cannot show a causal connection between her termination and her alleged disability– i.e. that she was terminated *because of* her disability or perceived disability. Plaintiff relies on the close proximity between her termination and when she allegedly informed Defendants that she suffers from chronic

9

The PDA defines a "disability" as follows:

> (*i*) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
>
> (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.
> . . .
>
> (*iii*) Being regarded as having a determinable physical or mental characteristic as described in subparagraph (i).

MICH. COMP. LAWS ANN. § 37.1103(d). To determine whether a plaintiff has a "disability" under the PDA, the Michigan courts apply the three-step process that the United States Supreme Court has adopted to determine whether an individual has a disability under the Americans with Disabilities Act:

> First, we consider whether respondent's complaint was a physical [or mental] impairment. Second, we identify the life activity upon which respondent relies . . . and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

*Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 474, 606 N.W.2d 398, 406 (1999) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S. Ct. 2196, 2202 (1998)). Where a

---

dysthymia as proof of Defendants' reason for terminating her. (Defs.' Mot. Ex. 2 at 202.) The Court will discuss Plaintiff's proximity argument when it addresses whether Plaintiff establishes that Defendants' asserted reason for terminating her is pretextual.

plaintiff alleges that the defendant regarded the plaintiff as disabled, "[the] plaintiff must adduce evidence that [the] defendant regarded the plaintiff as having an impairment that substantially limited a major life activity– just as with an actual disability." *Id*. at 475, 606 N.W.2d at 406 (citing *Murphy v. UPS, Inc.*, 527 U.S. 516, 119 S. Ct. 2133 (1999)). In other words, it is not enough for the plaintiff to simply show that the defendant thought the plaintiff was somehow impaired. *Id*.

Defendants argue that Plaintiff cannot establish that she is disabled under the statute because she cannot show that her alleged disability substantially limited her ability to engage in any major life activity. More specifically, Defendants point out that Plaintiff does not allege that her disability impairs her ability to work; rather, she only maintains that it interferes with her ability to perform work in a stressful, competitive, or "nit-picky" environment. (Defs.' Mot. Ex. 2 at 117, 200.)

In her complaint, Plaintiff only broadly asserts that she is a person with a disability for purposes of the PDA and that her disability "substantially limits one or more of her major life activities." (Compl. ¶¶ 10, 17, 18.) And in response to Defendants' motion, Plaintiff has not addressed Defendants' argument that she is not disabled or regarded as disabled, as defined by the PDA. Plaintiff does state in her response brief, however, that "[h]er disability was unrelated to her normal ability to perform her job duties; it merely made her job more difficult to perform at times."[7] (Pl.'s Resp. Br. at 6.) This is

---

[7]As Plaintiff fails to respond to Defendants' argument that she is not disabled as that term is defined under the PDA, she does not identify for the Court what "major life

consistent with Plaintiff's deposition testimony, where Plaintiff does not claim that she is incapable of working in general, but she acknowledges that she only makes mistakes in her work and is unable to concentrate on her job duties when her work environment is too stressful or competitive or she is attempting to do a good job and someone nitpicks, yells at her, or writes her up for ridiculous issues. (Defs.' Mot. Ex. 2 at 117, 160-61, 199-200.)

The inability to perform a particular job or to perform a job under particular circumstances or supervisors, however, does not constitute a substantial limitation with respect to the major life activity of working. *Chiles*, 238 Mich App. at 478, 606 N.W.2d at 407 (citing *Stevens v. Inland Waters, Inc.*, 220 Mich. App. 212, 218, 559 N.W.2d 61, 64 (1996)); *Fricke v. E.I. Dupont Co.*, 219 Fed. App'x 384, 389 (6th Cir. 2007) (unpublished opinion). "Instead, the impairment must significantly restrict an individual's ability to perform at least a wide range of jobs." *Chiles*, 238 Mich. App. at 478, 606 N.W.2d at 408; *see also* 29 C.F.R. § 1630.2(j)(3)(i) (providing that "[w]ith respect to the major life activity of working– [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes . . . The inability to perform a single, particular job does not

---

activity" she claims is affected by her impairment. Aside from Plaintiff's ability to work, there is no other activity discussed in the evidence submitted to the Court in support of or in opposition to Defendants' motion. Therefore, the Court must assume that Plaintiff is alleging "working" as the major life activity impacted by her chronic dysthymia.

constitute a substantial limitation in the major life activity of working").[8] As the Sixth Circuit stated in *Fricke*: "Personality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of [the statute]." 219 Fed. App'x at 389. Similarly, "[t]he major life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524-25 (7th Cir. 1996).

      The Court therefore concludes that Plaintiff fails to establish a genuine issue of material fact as to whether she is disabled or was regarded as disabled, as that term is defined in the PDA. In other words, Plaintiff presents no evidence that her chronic dysthymia substantially limits– or limits to any degree– her ability to work or engage in some other major life activity. Likewise, Plaintiff offers no evidence that Defendants regarded her as suffering from such an impairment.[9] The Court therefore concludes that

---

[8]The Michigan Courts look to the ADA and its implementing regulations for guidance in interpreting the terms "substantially limits" and "major life activities" under the PDA. *Stevens*, 220 Mich. App. at 217, 559 N.W.2d at 64.

[9]In fact Plaintiff establishes at most a genuine issue of material fact with respect to whether Sherman was aware that she suffered from chronic dsythymia based on the note from Dr. Horrigan that Plaintiff allegedly gave Sherman. Plaintiff presents no evidence suggesting that Sherman or anyone else at UAP was aware or believed that Plaintiff's condition substantially impaired her ability to perform a major life activity, such as working. "[S]howing that an employer thought that a plaintiff was somehow impaired is not enough; rather, a plaintiff must adduce evidence that a defendant regarded the plaintiff as having an impairment that substantially limited a major life activity . . ." *Chiles*, *supra*. The Court also observes that Dr. Horrigan's note, stating only that Plaintiff suffers from "chronic anxiety," may not have even put Defendants on notice that Plaintiff

13

Defendants are entitled to summary judgment with respect to Plaintiff's claims under the PDA.

> ### ii. Whether Plaintiff presents evidence showing that Defendants' reason for terminating her was a pretext for discrimination

Alternatively, Defendants are entitled to summary judgment with respect to Plaintiff's PDA claims because she fails to rebut Defendants' legitimate, non-discriminatory reason for terminating her– i.e. poor job performance. The only evidence Plaintiff offers to demonstrate pretext is the close proximity between her termination and when Sherman received Dr. Horrigan's note and her assertion that Defendants have provided "myriad excuses" for the decision to terminate her.

As to Plaintiff's proximity argument, Defendants demonstrate through Sherman's and Berger's affidavits that the decision to terminate Plaintiff was made before she allegedly gave Sherman the note from Dr. Horrigan. (Defs.' Mot. Ex. 5 ¶ 13; Ex. 12 ¶ 7.) Such evidence, contrary to Plaintiff's assertion, is sufficient to show that a causal connection does not exist. *See Strauss v. Mich. Dep't of Corrections*, 75 F. Supp. 2d 711, 727 (E.D. Mich. 1999), *aff'd* 250 F.3d 336 (6th Cir. 2001).

---

had "[a] determinable physical or mental characteristic." *See* MICH. COMP. LAWS ANN. § 37.1103(d) (defining "disability"). When asked at the motion hearing to identify evidence showing that Plaintiff informed Defendants of her "disability," Plaintiff's counsel only pointed to a few pages of the transcripts from Plaintiff's and Sherman's deposition. However, neither the testimony contained in those pages nor any other testimony (or other evidence) submitted to the Court, suggest that Plaintiff told anyone at UAP that she suffered from chronic dsythymia or any other disability or that she is disabled.

The Court also finds no evidence that Sherman or UAP have provided "myriad excuses" for Plaintiff's termination. Instead, the evidence is consistent that Defendants decided to terminate Plaintiff for poor work performance and that this was the only reason given Plaintiff.

Plaintiff points to Sherman's statement: "we've decided to let you go, and it's not because of what you think it is" and argues that "[t]his statement alone is illustrative of the subtext existing beneath Sherman's *stated* reasons, given as pretext, for discharging Plaintiff." (Pl.'s Resp. Br. at 4 (emphasis in original).) It is pure speculation by Plaintiff, however, as to what Sherman meant when he made this statement and the Court can find no basis for the trier of fact to conclude that Sherman was referring to Plaintiff's alleged disability.

Plaintiff also points to Sherman's alleged statement at the termination meeting that he does not need to provide proof to support the reason for her termination, as she is an at-will employee. (*Id*.) This statement, however, is in no way evidence of another "excuse" presented by Defendants for their termination decision.

Plaintiff further relies on a document from Michigan's Unemployment Insurance Agency to demonstrate that Defendants have provided multiple reasons for her termination. (Pl.'s Resp. Br. at 4, citing Ex. D.) This document lists the reason for Plaintiff's separation from UAP as "lack of work." (*Id*. Ex. D.) There is no evidence, however, that anyone at UAP was the source of this information. Further, Michigan law prohibits the use of information provided by an employer to the Unemployment Insurance

Agency in any court action or proceeding unless "the [agency] is a party to or a complainant in the action or proceeding, or unless used for the prosecution of fraud, civil proceeding, or other legal proceeding [related to certain welfare programs]." MICH. COMP. LAWS ANN. § 421.11(b)(1)(iii); *Summerville v. ESCO Co. Ltd. P'ship*, 52 F. Supp. 2d 804, 811-12 (W.D. Mich. 1999).[10]

Therefore, the Court finds that Plaintiff fails to create a genuine issue of material fact with respect to whether Defendants' proffered reason for terminating her was a pretext for disability discrimination. For this additional reason, the Court concludes that Defendants are entitled to summary judgment with respect to Counts I and II of Plaintiff's Complaint.

### B. Plaintiff's Claim under Michigan Public Policy

Under Michigan law, the following general rule applies to employment contracts:

> [I]n the absence of a contractual basis for holding otherwise, either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason.

*Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 694-95, 316 N.W.2d 710, 711 (1982) (citation omitted). The Michigan Supreme Court, however, has recognized an exception to this general rule, "based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id*. at 695, 316 N.W.2d

---

[10]The statute and *Sommerville* refer to the Michigan Employment Security Commission or the "Commission" which has been known as the Unemployment Insurance Agency since December 7, 2003. *See Alexander v. Atl. Auto. Components*, No. 4:06-CV-129, 2007 WL 708629, at *5 n. 6 (W.D. Mich. Mar. 5, 2007).

at 711. In *Sucholdolski*, the Court recognized three such grounds, which the Sixth Circuit Court of Appeals subsequently summarized as follows:

> The court in *Suchodolski* stated that public policy proscriptions of employment discharges ordinarily are based on one of three grounds: (1) explicit legislative statements prohibiting the discharge of employees who exercise a statutory right or perform a statutory duty, *e.g.*, The Whistleblowers' Protection Act, Mich.Comp.Laws § 15.632; (2) legislative statements of public policy that imply a cause of action for wrongful termination, *e.g.*, refusal to violate a law in the course of employment; and (3) an implied public policy prohibition of a discharge in retaliation for an employee's exercise of a legislatively conferred right, *e.g.*, filing of workers' compensation claims.

*Wiskotoni v. Mich. Nat'l Bank-West*, 716 F.2d 378, 382 (6th Cir. 1983) (citing *Suchodolski*, 412 Mich. at 695-96, 316 N.W.2d at 711-12).

In the present matter, Plaintiff concedes that UAP employed her as an at-will employee. (Defs.' Mot. Ex. 2 at 242; *see also* Ex. 6.) Plaintiff contends, however, the her termination violated Michigan public policy in that it was in violation of the PDA and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), MICH. COMP. LAWS ANN. §§ 37.2101-37.2804. (Pl.'s Resp. Br. at 12.) As the Court finds that Defendants are entitled to summary judgment with respect to Plaintiff's claims under the PDA, it concludes that Defendants are entitled to summary judgment with respect to Plaintiff's public policy claim premised on the same statute. With regard to the ELCRA, Plaintiff presents no evidence to suggest that Defendants violated that statute by terminating her. Moreover, Plaintiff contends that she was terminated because of her disability or because

17

Defendants regarded her as disabled. Being disabled or regarded as disabled, however, is not a protected classification under the ELCRA. *Weibel v. Salon Nadwa & Day Spa, Inc.*, No. 238765, 2003 WL 1879926, at *1 (Mich. Ct. App. April 15, 2003); MICH. COMP. LAWS ANN. § 37.2302(a) (prohibiting discrimination because of "religion, race, color, national origin, age, sex, or marital status). The Court therefore concludes that Defendants are entitled to summary judgment with respect to Plaintiff's claim that they violated Michigan public policy.

## IV. Conclusion

For the reasons discussed above, the Court concludes that Defendants are entitled to summary judgment with respect to Plaintiff's claims that they violated the PDA (Counts I and II) and Michigan Public Policy (Count III).

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is

**GRANTED**.  s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Brian J. Cole, Esq.
Khalid Shiekh, Esq.
Linda G. Burwell, Esq.
Monica M. Moore, Esq.